Slip Op. 17-147

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| RUBIES COSTUME CO., <br><br>                Plaintiff, <br><br>     v. <br><br> UNITED STATES, <br><br>                Defendant. | Before: Mark A. Barnett, Judge <br><br> Court No. 13-00407 |

## OPINION

[The court denies Plaintiff's motion for summary judgment and grants Defendant's cross-motion for summary judgment.]

Dated:  October 31, 2017

Glenn H. Ripa, John A. Bessich, and Suzanne L. McCaffery, Follick & Bessich, of New York, NY, for Plaintiff.

Peter A. Mancuso, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, for Defendant.  With him on the brief were Chad A. Readler, Acting Assistant Attorney General, and Amy M. Rubin, Assistant Director.  Of Counsel on the brief was Michael W. Heydrich, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection, of New York, NY.

Barnett, Judge:  In this case, the court addresses the issue of the proper

classification of a Santa Claus costume.  Is it a "festive article" entitled to duty free

treatment, or is it fancy dress, of textile, akin to wearing apparel, dutiable at the rates

applicable to the particular parts of the costume?  Application of classification principles

in this case (the General Rules of Interpretation, which direct the court to apply the

terms of the Harmonized Tariff Schedule, and relevant judicial precedent) leads to a

finding that, while flimsy and non-durable costumes (whether for Halloween, Christmas,

or any other holiday) generally receive duty free treatment as festive articles, and non-flimsy, durable Christmas sweaters may also receive duty free treatment as festive articles (because they are not fancy dress), a relatively well-made, durable, dry clean only Santa Claus costume constitutes fancy dress, of textile, and is, therefore, excluded from classification as a festive article.

Before the court are cross-motions for summary judgment. *See* Pl.'s Mot. for Summ. J., ECF No. 28, and Mem. of Law in Supp. of Pl.'s Mot. for Summ. J ("Pl.'s MSJ"), ECF No. 28-1; Def.'s Cross-Mot. for Summ. J. and Mem. in Supp. of Def.'s Cross-Mot. for Summ. J ("Def.'s XMSJ"), ECF No. 30. Plaintiff Rubies Costume Company ("Rubies" or "Plaintiff") contests the denial of its protest challenging U.S. Customs and Border Protection's ("Customs" or "CBP") classification of a multi-piece Santa Claus suit ("Santa Suit"). *See* Summons, ECF No. 1; Compl., ECF No. 5. Plaintiff contends the Santa Suit qualifies for duty free treatment as a "[f]estive, carnival or other entertainment article[]" (hereinafter referred to as a "festive article") pursuant to subheading 9505.10.50 of the Harmonized Tariff Schedule of the United States ("HTSUS"), or, alternatively, subheading 9505.90.60 of the HTSUS. Pl.'s MSJ at 2-3. Defendant United States ("Defendant" or the "Government") contends that Customs correctly classified the Santa Suit under tariff provisions corresponding to the individual garments and accessories that, together, compose the Santa Suit. Def.'s XMSJ at 1-2. For the following reasons, the court finds that the Santa Suit is not a festive article, and, therefore, is properly classified pursuant to the below-stated individual tariff provisions.

BACKGROUND

I.   **Material Facts Not in Dispute**

The party moving for summary judgment must show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." United States Court of International Trade ("USCIT") Rule 56(a).  Movants should present material facts as short and concise statements, in numbered paragraphs, and cite to "particular parts of materials in the record" as support.  USCIT Rule 56(c)(1)(A); *see also* USCIT Rule 56.3(a)("factual positions described in Rule 56(c)(1)(A) must be annexed to the motion in a separate, short and concise statement, in numbered paragraphs").  In responsive papers, the nonmovant "must include correspondingly numbered paragraphs responding to the numbered paragraphs in the statement of the movant."  USCIT Rule 56.3(b).  Parties filed cross motions for summary judgment and submitted separate statements of undisputed material facts with their respective motions.  *See* Pl.'s Am. Statement of Material Facts Not in Dispute ("Pl.'s SOF"), ECF No. 34; Def.'s Statement of Undisputed Material Facts ("Def.'s SOF"), ECF No. 30-1. Defendant also filed a response to Plaintiff's statement of facts.  *See* Def.'s Resp. to Pl.'s Statement of Material Facts Not in Dispute ("Def.'s Resp. to Pl.'s SOF"), ECF No. 30-2.  Plaintiff did not file a response to Defendant's statement of facts and has informed the court that it admits all of Defendant's factual assertions.  *See* Notice from the Court (June 26, 2017), ECF No. 36.  Parties also filed supplemental facts specific to the Santa Suit jacket.  *See* Pl.'s Resp. to the Court's Order of July 28, 2017 ("Pl.'s Suppl. Br."), Ex. 1 (CBP Lab Report NY20171073), ECF No. 40-1; Def.'s Resp. to the

Court Order Dated July 28, 2017 Req. Suppl. Briefing ("Def.'s Suppl. Br."), Ex. 2 (CBP

Lab Report NY20171073), ECF No. 41-2.  Upon review of the Parties' facts (and

supporting exhibits),[1] the court finds the following undisputed and material facts.[2]

Rubies, a wholesale and retail costume company, is the importer of record of the

subject Santa Suit.  Pl.'s SOF ¶¶ 1, 9; Def.'s Resp. to Pl.'s SOF ¶¶ 1, 9; *see also* Pl.'s

SOF ¶ 21; Def.'s Resp. to Pl.'s SOF ¶ 21 (subject merchandise is imported for domestic

resale).[3]  The Santa Suit consists of a red jacket, pants, and hat, a black belt with a

metal buckle, white gloves, black shoe covers, a white wig, and a Santa sack that are

packaged together for retail sale as the "Premier Plush 9 Piece Santa Suit."  Def.'s SOF

¶ 1.  Only the jacket, pants, gloves, and sack are at issue in this case.[4]

The jacket and pants consist of 73% acrylic and 27% knit polyester material,[5]

and have sewn-in care labels stating that each item is "Dry Clean Only."  *Id.* ¶¶ 2, 3.

---

[1] The exhibits include a physical sample of the Santa Suit.  *See* Def.'s XMSJ, Ex. 3 ("Physical Sample"), ECF No. 30-5 (certification of filing and service of physical exhibit or item).

[2] Citations are provided to the relevant paragraph number of the undisputed facts and response; internal citations generally have been omitted.

[3] Plaintiff also produces and sells children's Halloween costumes.  The "typical" children's Halloween costumes Plaintiff markets "do not have finished edges or zippers, and close in the back with Velcro or a snap, or are made to 'slipover' the wearer."  Def.'s SOF ¶¶ 19, 21.  Those costumes are intended for one-time use and retail for 10-20 USD.  *Id.* ¶¶ 22-23.

[4] The belt, beard, wig, hat, and shoe covers were liquidated duty free as entered under subheading 9505.90.60.  Pl.'s SOF ¶ 4; Def.'s Resp. to Pl.'s SOF ¶ 4; *see also* Def.'s XMSJ at 2 n. 1.

[5] Defendant does not expressly state that the jacket and pants are made from "knitted" material.  However, laboratory testing on the jacket performed in response to the court's inquiry demonstrates that the fabric (which matches the fabric used to construct the pants) "is of cut-pile weft knit construction."  Pl.'s Suppl. Br, Ex. 1; Def.'s Suppl. Br., Ex. 2.

The jacket is made in one "standard size," consists of plush fabric, and is fully lined with satin polyester.  *Id.* ¶ 4; Physical Sample.  The jacket fabric "has a stitch count per one centimeter of [seven] in the horizontal [direction] and [seven] in the vertical direction."  Pl.'s Suppl. Br, Ex. 1; Def.'s Suppl. Br., Ex. 2.  The jacket has "a full front opening secured by a zipper," which is hidden by a left-over-right faux fur cover held in place by two metal snaps, one at the collar of the jacket and one at the base of the jacket.  Def.'s SOF ¶¶ 6-7.  The double-layer collar consists of white faux fur fabric.  *Id.* ¶ 5.  "The jacket has long sleeves with turned edges, trimmed with white faux fur fabric cuffs," *id.* ¶ 8, and "a straight cut hemmed bottom trimmed with the same white faux fur fabric," *id.* ¶ 9.  The jacket may be worn over other clothing or undergarments, *id.* ¶ 10, and has belt loops for the belt, Physical Sample.  The pants have a satin polyester lining, pockets with hemmed edges, an elasticized waist, and tightly stitched interior seams.  Def.'s SOF ¶¶ 11-12.  The white knit gloves consist of 100% polyester knit fabric.  *Id.* ¶ 13.[6]  The sack is made from the same material as the jacket and pants, and has a drawstring cord.  *Id.* ¶ 14.  The Santa Suit packaging describes the sack as a "toy bag." Physical Sample.

The Santa Suit has a wholesale price of USD 60-70 and a retail price of USD 100, which is considered "a mid-to-high price point."  *Id.* ¶ 24.  It is "manufactured to be worn repeatedly during a single Christmas season" and "is intended to survive multiple wearings and cleanings" over several Christmas seasons.  *Id.* ¶¶ 25-26.  The Santa Suit

---

[6] Physical inspection of the gloves reveals strips of material that form the sides of two adjacent fingers.  *See* Physical Sample.

covers the body of the individual wearing it and provides warmth and protection to the

wearer.  *Id.* ¶ 27.

## II.   Procedural History

On June 20, 2012, Rubies sought a binding pre-importation ruling from Customs

regarding the classification of the Santa Suit.  *See* Def.'s XMSJ, Ex. 2 ("HQ H237067"),

ECF No. 30-4.  On June 20, 2013, Customs issued its ruling.  *See generally* HQ

H237067.  Relying on the Court of Appeals for the Federal Circuit's ("Federal Circuit")

opinion in *Rubie's Costume Co. v. Unites States* ("*Rubie's II*"),[7] 337 F.3d 1350 (Fed. Cir.

2003),[8] and Customs' informed compliance publication regarding the classification of

textile costumes, Customs distinguished the "well-made" Santa Suit from the "flimsy

costumes" it classifies as festive articles.  HQ H237067 at 6-9.[9]  Accordingly, Customs

determined that the jacket and pants are classifiable as "wearing apparel" under

headings 6105 and 6103, respectively.  *Id.* at 9.  Customs further found that the gloves

and sack are classifiable under headings 6116 and 4202, respectively.  *Id.* at 9-10.

---

[7] *Rubie's II* reversed the USCIT's decision in *Rubie's Costume Co. v. United States* ("*Rubie's I*"), 26 CIT 209, 196 F. Supp. 2d 1320 (2002).  In *Rubie's II*, the same plaintiff as in this case (but therein described as a domestic manufacturer of costumes) had filed a Domestic Interested Party Petition asserting that all imported textile costumes should be classified as wearing apparel in Chapters 61 or 62.  337 F.3d at 1352.

[8] In accordance with the summons filed in this case, there is no apostrophe in "Rubies." *See* Summons at 1.  In contrast, in the case giving rise to the *Rubie's I* and *Rubie's II* opinions, the summons contains an apostrophe in "Rubie's" in the case caption.  *See Rubie's Costume Co. v. United States*, Court No. 99-00388, ECF No. 44 (electronic docket sheet).

[9] Following the Federal Circuit's opinion in *Rubie's II*, in June 2008 Customs issued an informed compliance publication titled, "*What Every Member of the Trade Community Should Know About: Classification of Textile Costumes under the HTSUS.*"  *See* Def.'s XMSJ, Ex. 5 ("Textile Costumes ICP" or "the ICP"), ECF No. 30-7.

On August 20, 2013, Plaintiff entered 36 Santa Suits under Entry Number BPQ-1066668-8 through the John F. Kennedy Airport in New York.  Compl. ¶¶ 5-6; Answer ¶¶ 5-6, ECF No. 11; *see also* Summons at 1.  On October 25, 2013, Customs liquidated the Santa Suits as follows:

| Item | HTSUS Classification | Duty Rate |
|---|---|---|
| Jacket | 6105.20.20 | 32.0% *ad valorem* |
| Pants | 6103.43.15 | 28.2% *ad valorem* |
| Gloves | 6115.95.60[10] | 10.0% *ad valorem* |
| Sack | 4202.92.30 | 17.6% *ad valorem* |
| Beard, Wig, Hat, Belt, and Shoe covers | 9505.90.60 | Free of Duty |

Pl.'s SOF ¶ 4; Def.'s Resp. to Pl.'s SOF ¶ 4.

Rubies timely protested Customs' classification of the subject merchandise; on December 14, 2013, that protest was deemed denied.  Pl.'s SOF ¶¶ 5-6; Def.'s Resp. to Pl.'s SOF ¶¶ 5-6; *see also* Summons at 1.  Rubies challenges the denial of its protest. Parties have fully briefed the issues.  The court now rules on the cross-motions for summary judgment.

---

[10] Defendant contends the gloves should have been classified under subheading 6116.93.94.  Def.'s Resp. to Pl.'s SOF ¶ 4.  *Cf.* HQ H237067 at 9 (finding the gloves classifiable under heading 6116).  Heading 6115 covers "Panty hose, tights, stockings, socks and other hosiery, including graduated compression hosiery (for example, stockings for varicose veins) and footwear without applied soles, knitted or crocheted," and, thus, does not describe the subject gloves.

## JURISDICTION AND STANDARD OF REVIEW

The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1581(a).

Jurisdiction is uncontroverted in this case.  Pl.'s SOF ¶ 2; Def.'s Resp. to Pl.'s SOF ¶ 2.

The court may grant summary judgment when "there is no genuine issue as to

any material fact," and "the moving party is entitled to judgment as a matter of law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); USCIT R. 56(a).  The court's

review of a classification decision involves two steps.  First, it must determine the

meaning of the relevant tariff provisions, which is a question of law.  *See Bausch &*

*Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998) (citation omitted); *see*

*also id.* at 1366 (characterizing the first step as "constru[ing] the relevant (competing)

classification headings").  Second, it must determine "what the merchandise at issue is,"

which is a question of fact.  *Id.* at 1366.  When no factual dispute exists regarding the

merchandise, summary judgment is appropriate and resolution of the classification turns

solely on the first step.  *See id.* at 1365-66; *id.* at 1365 ("The ultimate question in a

classification case is whether the merchandise is properly classified under one or

another classification heading," which is "a question of law[] . . . because what is at

issue is the meaning of the terms set out in the statute . . . .") (citations omitted); *see*

*also Sigma–Tau HealthScience, Inc. v. United States*, 838 F.3d 1272, 1276 (Fed. Cir.

2016) (citations omitted).

The court reviews classification cases on "the basis of the record made before

the court."  28 U.S.C. § 2640(a).  While the court accords deference to Customs'

classification rulings relative to their "power to persuade," *United States v. Mead Corp.*,

533 U.S. 218, 235 (2001) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)),

it has "an independent responsibility to decide the legal issue of the proper meaning and

scope of HTSUS terms," *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1209

(Fed. Cir. 2005) (citing *Rocknel Fastener, Inc. v. United States*, 267 F.3d 1354, 1358

(Fed. Cir. 2001)).  It is "the court's duty to find the *correct* result, by whatever procedure

is best suited to the case at hand."  *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878

(Fed. Cir. 1984).

DISCUSSION

## I.   Legal Framework

The General Rules of Interpretation ("GRIs") provide the analytical framework for

the court's classification of goods. *See N. Am. Processing Co. v. United States,* 236

F.3d 695, 698 (Fed. Cir. 2001).  "The HTSUS is designed so that most classification

questions can be answered by GRI 1." *Telebrands Corp. v. United States,* 36 CIT ___,

___, 865 F. Supp. 2d 1277, 1280 (2012), *aff'd* 522 F. App'x 915 (Fed. Cir. 2013).  GRI 1

states that, "for legal purposes, classification shall be determined according to the terms

of the headings and any [relevant] section or chapter notes."  GRI 1, HTSUS.  The court

considers chapter and section notes of the HTSUS in resolving classification disputes

because they are statutory law, not interpretive rules.  *See Arko Foods Int'l, Inc. v.*

*United States*, 654 F.3d 1361, 1364 (Fed. Cir. 2011) (citations omitted); *see also Park*

*B. Smith, Ltd. v. United States*, 347 F.3d 922, 929 n. 3 (Fed. Cir. 2003) (chapter

and section notes are binding on the court).

"Absent contrary legislative intent, HTSUS terms are to be 'construed [according] to their common and popular meaning.'" *Baxter Healthcare Corp. of Puerto Rico v. United States,* 182 F.3d 1333, 1337 (Fed. Cir. 1999) (quoting *Marubeni Am. Corp. v. United States,* 35 F.3d 530, 533 (Fed. Cir. 1994)).  Courts may rely upon their own understanding of terms or consult dictionaries, encyclopedias, scientific authorities, and other reliable information.  *Brookside Veneers, Ltd. v. United States,* 847 F.2d 786, 789 (Fed. Cir. 1988); *BASF Corp. v. United States,* 35 CIT ___, ___, 798 F. Supp. 2d 1353, 1357 (2011).  For additional guidance on the scope and meaning of tariff headings and chapter and section notes, the court also may consider the Explanatory Notes to the Harmonized Commodity Description and Coding System, developed by the World Customs Organization.  *See Deckers Outdoor Corp. v. United States*, 714 F.3d 1363, 1367 n. 1 (Fed. Cir. 2013).  Although Explanatory Notes do not bind the court's analysis, they are "indicative of proper interpretation" of the tariff schedule.  *Lynteq, Inc. v. United States*, 976 F.2d 693, 699 (Fed. Cir. 1992) (quoting H.R. Rep. No. 100–576, at 549 (1988) (Conf. Rep.), reprinted in 1988 U.S.C.C.A.N. 1547, 1582).

## II.   Competing Tariff Provisions

Plaintiff contends the Santa Suits are properly classified as festive articles under subheading 9505.10.50 or, alternatively, 9505.90.60.  Pl.'s MSJ at 2-3.  Chapter 95 covers "Toys, Games, and Sports Requisites; Parts and Accessories thereof."  The asserted subheadings (and relevant legal notes) are as follows:

**9505**: Festive, carnival or other entertainment articles, including magic tricks and

practical joke articles; parts and accessories thereof:

**9505.10**:  Articles for Christmas festivities and parts and accessories thereof:

    **9505.10.50**:   Other ……………………………………………Free.

**9505.90**:  Other:

    **9505.90.60**:   Other ……………………………………………Free.

Pursuant to the chapter notes, "fancy dress, of textiles, of chapter 61 or 62," are excluded from classification under Chapter 95.  Ch. 95, Note 1(e).  Also excluded are "[s]ports bags or other containers of heading 4202, 4303 or 4304," Ch. 95, Note 1(d), and "gloves, mittens and mitts (classified according to their constituent material)," Ch. 95, Note 1(u).

Defendant contends the jacket, pants, and gloves are properly classified as articles of apparel pursuant to subheadings of Chapter 61, and the sack is properly classified pursuant to a subheading of Chapter 42.  Def.'s XMSJ at 1-2.  Chapter 61 covers "Articles of Apparel and Clothing Accessories, Knitted or Crocheted."  Chapter 42 covers "Articles of Leather; Saddlery and Harness; Travel Goods, Handbags and Similar Containers; Articles of Animal Gut (other than Silkworm Gut)."  The specific subheadings (and relevant legal notes) asserted by Defendant are as follows:

**6103**:  Men's or boys' . . . trousers, . . . breeches and shorts (other than swimwear), knitted or crocheted:

    **6103.43**: Of synthetic fibers:

        **6103.43.15**: Other ………………………….……………28.2% *ad valorem*.

**6105**:  Men's or boys' shirts, knitted or crocheted:

    **6105.20**: Of man-made fibers:

**6105.20.20**: Other …………………….…………...…….32% *ad valorem*.

**6116**: Gloves, mittens and mitts, knitted or crocheted:

**6116.93**: Of synthetic fibers:

**6116.93.94**: Other: With fourchettes……………………18.6% *ad valorem*.

**4202**: [T]traveling bags, . . . knapsacks and backpacks, handbags, shopping bags, . . .
sports bags, . . . and similar containers, . . . of textile materials, . . . or wholly or
mainly covered with such materials . . . :

**4202.92**: Other: With outer surface of sheeting of plastic or of textile materials:

Travel, sports and similar bags: With outer surface of textile materials:

**4202.92.30**: Other …………………………….…………… 17.6% *ad valorem*.

Section XI, which includes Chapter 61, excludes "[a]rticles of chapter 95."  Sect.
XI, Note 1(t).[11]  Pursuant to Note 9 to Chapter 61, "[g]arments of this chapter designed
for left over right closure at the front shall be regarded as men's or boys' garments."  Ch.
61, Note 9.  Chapter 42 also excludes "[a]rticles of chapter 95."  Ch. 42, Note 1(l).
Pursuant to Additional U.S. Note 1 to Chapter 42, "[f]or the purposes of heading 4202,
the expression 'travel, sports and similar bags' means goods . . . of a kind designed for
carrying clothing and other personal effects during travel, including backpacks and
shopping bags of this heading . . . ."  Ch. 42, Add'l U.S. Note 1.

---

[11] Also relevant is Note 14 to Section XI, which provides that "[u]nless the context
otherwise requires, textile garments of different headings are to be classified in their
own headings even if put up in sets for retail sale. For the purposes of this note, the
expression 'textile garments' means garments of headings 6101 to 6114 and headings
6201 to 6211."  Sect. XI, Note 14.

The legally binding notes attendant to Chapters 42, 61, and 95 demonstrate that articles may be described by headings of each chapter, and "expressly resolve[] this conflict in favor of classification in chapter 95" *unless* the article falls into one of Chapter 95's exclusionary notes.  *See Michael Simon Design, Inc. v. United States*, 501 F.3d 1303, 1305, 1306-07 (Fed. Cir. 2007) (explaining that note 1(e) to Chapter 95 excludes "only certain clothing articles"; thus, festive sweaters were properly classified as festive articles and not wearing apparel).  In other words, Chapter 95's exclusionary notes provide exceptions to the general rule of classification thereunder for particular articles of Chapters 42, 61, and 62.  *See* Sect. XI, Note 1(t) (Chapter 61 excludes "[a]rticles of chapter 95); Ch. 42, Note 1(l) (Chapter 42 excludes "[a]rticles of chapter 95).  *But see* Ch. 95, Notes 1(d), (e), (u) ("[s]ports bags or other containers" of headings 4202, 4303, and 4304; "fancy dress, of textiles, of chapter 61 or 62"; and "gloves . . . (classified according to their constituent material)" are not covered by Chapter 95).  Accordingly, for Plaintiff's asserted classification to be correct, the components of the Santa Suit must be *prima facie* classifiable as festive articles *and* must not be covered by any of Chapter 95's exclusions.  As discussed below, the Santa Suit components are covered by the exclusions to Chapter 95; thus, the court need not and does not reach the issue of whether they constitute festive articles.[12]

---

[12] In its moving brief, Plaintiff contends that

the classification of the Santa [Suit] at issue *should not* be determined on the basis of an analysis that focuses primarily and arbitrarily on the type of construction and/or the quality of the materials, and diminishes the intended use of the costume, and the festive holiday or occasion for which it was designed. . . . The determination as to whether a costume is

## III.    Classification of the Jacket and Pants

The GRIs govern the proper classification of merchandise and are applied in

numerical order.  *N. Am. Processing Co.*, 236 F.3d at 698.  Pursuant to GRI 1, the court

first "must determine the appropriate classification 'according to the terms of the

headings and any relative section or chapter notes' . . . [with] terms of the HTSUS . . .

construed according to their common commercial meaning."  *Millenium Lumber Dist.*

*Ltd. v. United States*, 558 F.3d 1326, 1328-29 (Fed. Cir. 2009) (citations omitted).

### A.  Construction of Note 1(e) to Chapter 95

Pursuant to Note 1(e), "fancy dress, of textiles, of chapter 61 or 62," is barred

from classification under chapter 95.  Ch. 95, Note 1(e).  That phrase is not defined in

the HTSUS.  In *Rubie's II*, however, the Federal Circuit spoke to the meaning of the

phrase and addressed when costumes should be classified as festive articles rather

than wearing apparel.  337 F.3d at 1356-60.  The court's analysis, therefore, begins with

---

classifiable as a festive article *is more properly based upon* whether it is
closely associated with a festive occasion, whether it is displayed or used
principally during that festive occasion, and whether its nature and
appearance precludes its characterization as wearing apparel.
Pl.'s MSJ at 22 (emphasis added).  According to Plaintiff, the Federal Circuit's opinions
in *Michael Simon Design*, 501 F.3d 1303, and *Park B. Smith*, 347 F.3d 922, provide the
proper criteria for classifying the Santa Suit.  Pl.'s MSJ at 22-23.  Those cases provide
the test for determining whether an article is a festive article under heading 9505.  *See
Michael Simon Design*, 501 F.3d at 1306 (citing *Park B. Smith*, 347 F.3d at 927).  They
do not interpret Chapter 95's exclusionary notes and, thus, address only part of the
pertinent inquiry.  As discussed *infra*, Chapter 95's exclusionary notes bar classification
pursuant to that chapter; therefore, the court does not address Plaintiff's arguments
regarding the proper application of the Federal Circuit's festive article test to the subject
merchandise.  *See* Pl.'s MSJ at 19-21; Pl.'s Affirmation in Opp'n to Summ. J. Mot. ("Pl.'s
Resp.") at 8-9, ECF No. 32; *see also* Def.'s XMSJ at 20-21; Reply Mem. of Law in Supp.
of the Government's Cross-Mot. for Summ. J. ("Def.'s Reply") at 12-13, ECF No. 35.

an explication of the Federal Circuit's opinion and related judicial and Customs rulings to the extent that they illuminate the proper construction of Note 1(e).

The merchandise at issue in *Rubie's II* consisted of five textile costumes "traditionally worn [at] . . . Halloween or to costume parties." *Id.* at 1352. They included a child-sized "Witch of the Webs" dress, "Pirate Boy" top and pants, and "Witch" dress, an adult-sized "Abdul, Sheik of Arabia" sheath, and a "Cute and Cuddly Clown" jumpsuit. *Id.* at 1352 & n.2. On June 2, 1997, in response to a request filed by Rubie's, Customs determined "that the 'Cute and Cuddly Clown' would be classified as 'Babies' garments and clothing accessories' with a duty rate of 16.7 (now 16.1) percent *ad valorem*, while the other costumes . . . would be classified as 'festive articles,' requiring duty free entry." *Id.* at 1352 (citing HQ 959545 (June 2, 1997)). Thereafter, Customs denied the Domestic Interested Party Petition filed by Rubie's, which asserted that the five textile costumes should be classified as wearing apparel, and affirmed its prior determination. *Id.* at 1352-53 (citing HQ 961447 (July 22, 1998) ("HQ 961447")); *see also supra* note 8.

HQ 961447 reiterated the classification analysis that Customs had relied on for the decade prior to its issuance, tracing its origin to a case in this court styled as *Traveler Trading Co. v. United States*, 13 CIT 380, 713 F. Supp. 409 (1989)). *See* HQ 961447 at 2; *Rubie's II*, 337 F.3d at 1353, 1358. In that case, Traveler Trading Co. ("Traveler") sued the United States regarding Customs' classification of "flimsy" adult textile costumes as "wearing apparel" under the predecessor to the HTSUS, the TSUS, rather than as "toys" as it classifies children's costumes. *Traveler*, 13 CIT at 380, 384,

713 F. Supp. at 410, 413.  During settlement negotiations, Customs reconsidered its

basis for distinguishing adult Halloween costumes from children's Halloween costumes.

*Id.* at 380-81, 713 F. Supp. at 410-11.  Customs reasoned that "[t]hese are costumes

which are flimsily constructed and possess no significant utilitarian value. . . . These

costumes are distinguishable from theatrical costumes or religious and folk-like regalia

which are detailed, well-constructed, and intended for a specific use other than mere

amusement."  *Id.* at 380-81, 713 F. Supp. at 410-11 (citation omitted).  In ruling on

Traveler's application for attorneys' fees and costs, the court deemed "unreasonable"

Customs' initial classification of "flimsy [adult] Halloween costumes as wearing apparel."

*Id.* at 383-84, 713 F. Supp. at 412-13 (distinguishing "expensive, well-constructed

ballroom gowns, safari outfits, certain types of uniforms, and other adult garments,"

which "may serve as both Halloween costumes and wearing apparel" from "witches,

pirates, and [similar costumes], which are flimsily constructed") (internal quotation

marks and citation omitted).

A few years later, Traveler again sued the United States over Customs'

"classification of textile costumes as articles of 'fancy dress' excluded from classification

in Chapter 95 [of the HTSUS]."  HQ 961447 at 2 (citing *Traveler Trading Co. v. United

States*, Court No. 91-02-00084).  Customs subsequently determined that the court's

opinion in *Traveler* and recent judicial opinions concerning relevant provisions of the

HTSUS meant that it should "reexamine[] its view regarding the scope of the term 'fancy

dress' as it relates to costumes."  HQ 961447 at 2 (noting that "Customs [initially] took

the view that fancy dress included 'all' textile costumes regardless of quality, durability,

or the nature of the item").  Following the execution of a settlement agreement between

Customs and Traveler, Customs issued HQ 957318 (Nov. 15, 1994) ("HQ 957318"),

wherein it stated that costumes that "are of a flimsy nature and construction, lack

durability, and are generally recognized as not normal articles of apparel" would be

classified as festive articles.  HQ 957318 at 1; *see also* HQ 961447 at 2.

In later rulings, Customs identified certain characteristics that it would assess to

determine whether an article was "of a flimsy nature and construction, lacking in

durability, and generally [not] recognized as a normal article of apparel."  HQ 961447 at

4 (citations omitted) (identifying "zipper closures," "abundant styling features such as a

fitted bodice with darts," "petal shaped panels sewn into a waistline," and

"sheer/decorative panels sewn into the seams of costumes" as indicative of fancy

dress).  Applying those characteristics to the merchandise at issue in *Rubie's II*,

Customs determined that four of the five costumes were classifiable as festive articles.

*Id.* (noting that those costumes "featured simple pull-on type garments with no zippers,

inset panels, darts, or hoops," and raw and unhemmed edges leaving the costumes

"susceptible to runs and frays").  In contrast, the "Cute and Cuddly Clown" costume

"was particularly well-constructed and had a substantial amount of finishing work (i.e.,

the sewing used to construct the article)," and did not have any raw edges.  *Id.*  For

those reasons, Customs classified the Cute and Cuddly Clown costume as wearing

apparel.  *Id.*

On appeal to the USCIT, the court disagreed with Customs' interpretation of Note

1(e).  *Rubie's I*, 26 CIT at 210, 196 F. Supp. 2d at 1322.  Citing several dictionary

definitions, the court defined "fancy dress" as synonymous with "costume" generally,

and, therefore, rejected the Government's argument that "fancy dress" is limited to

"elaborate or substantial costumes such as those worn by actors in the theater, and

formal wear such as tuxedos and ball gowns worn to special events."  *Id.* at 216-17, 19

F. Supp. 2d at 1328 (citations omitted).[13]  The *Rubie's I* court proceeded to examine the

scope of Chapters 61 and 62 to determine the type of fancy dress (costumes) excluded.

*Id.* at 219, 196 F. Supp. 2d at 1330-31.  Relying on the U.S. Supreme Court's opinion in

*Arnold*[14] and this court's opinion in *H.I.M./Fathom*,[15] the *Rubie's I* court found that "for

merchandise to be properly classified within Chapters 61 or 62, strong emphasis must

be placed on the material[16] of the merchandise and whether it could be worn at a

particular time."  *Id.* at 219, 196 F. Supp. at 1331.  Because the costumes at issue were

"meant to adorn the human body at a particular time, either on Halloween or at any

other event where the wearer desires to mimic another," and as they were "within the

---

[13] The *Rubie's I* court determined that *Traveler*, which addressed tariff provisions covering wearing apparel and toys, was inapposite because it related to the pre-HTSUS code and the interpretation of the term "fancy dress" was not at issue.  *Rubie's I*, 26 CIT at 217-18, 196 F. Supp. 2d at 1329.  Accordingly, the *Rubie's I* court rejected Customs' reliance on "[t]he criteria of flimsiness" favored in *Traveler* as a way to distinguish costumes that are classifiable as toys from costumes that are classifiable as wearing apparel.  *Id.*
[14] In *Arnold*, the Court defined "wearing apparel" as "embracing all articles which are ordinarily worn, [] dress in general."  *Arnold v. United States*, 147 U.S. 494, 496 (1893).
[15] In *H.I.M./Fathom*, the court concluded that wetsuits constituted clothing because they "are articles worn as an outer covering for the human body at a particular time." *H.I.M./Fathom, Inc. v. United States*, 21 CIT 776, 781, 981 F. Supp. 610, 615 (1997).
[16] Chapter 61 covers *knitted or crocheted* "Articles of Apparel and Clothing Accessories," whereas Chapter 62 covers "Articles of Apparel and Clothing Accessories" that are *not knitted or crocheted*.

norms of apparel as it is viewed in the United States," the *Rubie's I* court held that the

costumes were classifiable pursuant to subheading 6114.30.30 of the HTSUS.  *Id.* at

219-220, 196 F. Supp. at 1331.

The Federal Circuit reversed on the basis that HQ 961447 was sufficiently

persuasive to be accorded *Skidmore* deference.  *See Rubie's II*, 337 F.3d at 1356;

*Skidmore*, 323 U.S. at 140.  The Federal Circuit agreed with the lower court that "fancy

dress" means "a costume (as for a masquerade or party) departing from conventional

style and [usually] representing a fictional or historical character."  *Rubie's II*, 337 F.3d

at 1356-57 (citing *Rubie's I*, 26 CIT at 216, 196 F. Supp. at 1327); *see also id.* at 1357

("That the term 'fancy dress,' . . . includes costumes is plain enough . . . .").  According

to the Federal Circuit, however, the lower court insufficiently analyzed the *type* of fancy

dress excluded:

> a reading of the exclusion in Note 1(e) to Chapter 95, HTSUS, that
> focuses solely on the term "fancy dress" and turns a blind eye to the
> immediately following words "of textiles, of chapter 61 or 62" construes the
> term fancy dress in disregard of the context of the exclusion as a whole. . .
> .  The words in Note 1(e) "of textiles, of chapter 61 or 62" immediately
> following "fancy dress," establish the context in which the term "fancy
> dress" is to be applied, and thereby *circumscribe, qualify, and limit the
> type of "fancy dress"* that was intended by the drafters to be excluded from
> Chapter 95, HTSUS, to textile costumes falling within the purview "of
> chapter 61 or 62."  Thus, . . . the exclusion to Chapter 95, HTSUS,
> encompasses textile costumes that are classifiable as "wearing apparel"
> under Chapter 61 or 62.

*Id.* (emphasis added).  The Federal Circuit interpreted "wearing apparel" as "embracing

all articles which are *ordinarily* worn—dress in general," *id.* (quoting *Arnold*, 147 U.S. at

496), and "clothes or coverings for the human body worn for decency or comfort," *id.*

(quoting *Antonio Pompeo v. United States*, 40 Cust. Ct. 362, 364 (1958) (also noting

that "common knowledge indicates that adornment is also an element of many articles

of wearing apparel")).

   "Cognizant of [those] definitions," the Federal Circuit found HQ 961447 "logical

and well-reasoned." *Id*. The court determined that HQ 961447 correctly classifies as

festive articles "flimsy, non-durable costumes having utility and used as well for festive

occasions, based on functional or structural deficiencies as compared with the standard

counterpart articles (e.g., wearing apparel)." *Id*. The court cited Customs' identification

of "the texture and quality of the materials as 'flimsy and non-durable'" suggesting that

the textile costumes' "principal intended use is for a one time festive occasion [which]

[is] distinct from 'wearing apparel' which the courts have held to be used for decency,

comfort, adornment or protection." *Id*. (quoting HQ 961447) (second alteration

added).[17]   Additionally, although the subject merchandise "may simulate the structural

features of wearing apparel, and have some incidents of 'clothes or coverings for the

human body worn for decency or comfort,'" *id*. at 1358 (quoting *Antonio Pompeo*, 40

Cust. Ct. at 364), "they are not practical 'articles which are ordinarily worn,'" *id*. (quoting

*Arnold*, 147 U.S. at 496); *see also id*. ("[T]he Halloween costumes . . . have enormous

'make believe' or festive value . . . and incidentally afford the element of covering for

decency or comfort."). The Federal Circuit, therefore, was persuaded by Customs' view

---

[17] The court also approved of Customs' consideration of "such factors as the extent of
the styling features such as zippers, inset panels, darts or hoops, and whether the
edges of the materials had been left raw or finished" to determine the "texture and
quality of the [costumes'] materials."  *Rubie's II*, 337 F.3d at 1357 (citing HQ 961447).

that "fancy dress" for purposes of Note 1(e) does not include "imported textile costumes

[that] are of a flimsy nature and construction, lacking in durability and generally not

recognized as normal articles of wearing apparel"; instead, such costumes are

classifiable as "festive articles." *Id.* at 1360.[18]  Accordingly, this court is guided by the

---

[18] Strictly speaking, the Federal Circuit held that "[w]hen the imported textile costumes are of a flimsy nature and construction, lacking in durability and generally not recognized as normal articles of wearing apparel, it is neither illogical nor unreasonable to conclude that the subject merchandise is classifiable as festive articles." *Id.* at 1360. However, the context of the opinion, the court's discussion therein, and the fact that "festive articles" and "fancy dress, of textiles, of Chapters 61 or 62" are mutually exclusive categories, supports the conclusion that the court's holding regarding the nature of the items that belong in the first category reflect its opinion regarding those that do not belong in the second category.

This understanding is supported by Customs' ICP regarding the classification of textile costumes.  *See supra* note 9; Textile Costumes ICP.  Pursuant to *Rubie's II*, the Textile Costumes ICP recommends that "all flimsy, non-durable textile costumes that are not recognized as ordinary articles of apparel are classified under 9505.90.6000, HTSUS[] (flimsy); all textile costumes that exceed the flimsy, non-durable standards or are recognized as ordinary articles of apparel are classified in Chapters 61 or 62, HTSUS[] (well-made)."  *Id.* at 10.

Additionally, the ICP's guidance recognizes that Customs' flimsiness analysis is distinct from the inquiry whether an item is an ordinary article of apparel.  This distinction makes sense given the origin of Customs' flimsiness analysis as determining "the scope of the term 'fancy dress' as it relates to costumes."  Textile Costumes ICP at 9; *see also* HQ 961447 at 2.  Customs does not employ its flimsiness analysis to determine what constitutes apparel for purposes of Chapter 61 or 62; rather, "CBP only applies this test to garments which are *prima facie* classifiable in Chapter 95."  HQ H145555 (Aug. 6, 2012) at 9 (declining to apply the test for what constitutes "fancy dress" for purposes of Note 1(e) as discussed in *Rubie's II* to determine whether the subject item (the "Snuggie®") should be classified as a garment or a blanket) (citing Textile Costumes ICP).  *But cf. Allstar Marketing Group, LLC v. United States*, 41 CIT ___, ___, 211 F. Supp. 3d 1319, 1329-31 (2017) (*Rubie's II*'s discussion of what constitutes "wearing apparel" informs the court's interpretation of "garment" pursuant to subheading 6114.30.30).

same criteria.[19]  *Avenues in Leather, Inc. v. United States*, 423 F.3d 1326, 1331 (Fed.

Cir. 2005) (the Federal Circuit's interpretation of tariff terms are binding on this court).

    **B. Whether the Jacket and Pants are "Fancy Dress, of Textiles, of Chapter 61 or 62"**

      **a. Parties' Contentions**

    Plaintiff contends that the Santa Suit "is not well-made, and does not meet

wearing apparel production standards."  Pl.'s MSJ at 9.[20]  To support its contention,

Plaintiff primarily relies on a report prepared by its expert witness, Roni Start.[21]  *See*

---

[19] Plaintiff contends that *Rubie's II* "established" that the type of fancy dress excluded by Note 1(e) consists of "expensive and well-constructed *ballroom gowns*, *safari outfits* such as those used for hunting, certain types of *uniforms*, and other adult *garments*. Pl.'s MSJ at 15.  As Defendant contends, however, the Federal Circuit did not disturb Customs' finding that the "Cute and Cuddly Clown" costume met the criteria for fancy dress.  Def.'s XMSJ at 15.  Thus, the Federal Circuit's understanding of that term is not so limited.  Moreover, the *Rubie's II* court's only reference to such items is contained in a passing reference to what "Customs determined."  337 F.3d at 1356 ("Customs determined that 'fancy dress . . . of chapter 61 or 62' refers to elaborate or substantial costumes such as 'expensive, well-constructed ballroom gowns, safari outfits, certain types of uniforms, and other adult garments.'") (citing HQ 961447).  Customs did not, however, define fancy dress in that manner.  Rather, it was, in part, the *Traveler* court's view that "expensive, well-constructed ballroom gowns, safari outfits, certain types of uniforms, and other adult garments may serve both as Halloween costumes and wearing apparel" that prompted Customs to "reexamine[] its view regarding the scope of the term 'fancy dress' as it relates to costumes."  HQ 961447 at 2; *see also Traveler*, 13 CIT at 383, 713 F. Supp. at 412.

[20] Plaintiff presents its arguments in connection with the Santa Suit generally, although, as previously noted, only the jacket, pants, gloves, and sack are at issue here.  *See supra* note 4 and accompanying text.

[21] Defendant does not contest Ms. Start's qualifications.  *See* Def.'s XMSJ at 28-32. Ms. Start is the Department Chair of Apparel Industry Management and Menswear at the Fashion Institute of Design and Merchandising in Los Angeles, California, and the Owner/President of RJM Consulting.  Start Report, Ex. A ("Start Resume"), ECF No. 28-3.  Plaintiff also submitted Ms. Start's deposition testimony.  *See* Pl.'s MSJ, Ex. 5 ("Start Dep."), ECF No. 28-5.

Pl.'s MSJ, Ex. 3 ("Start Report"), ECF No. 28-3.[22]  Ms. Start distinguishes "well-made"

from "well-sewn," and concludes that the Santa Suit "is not well-made."  Start Report at

10 ("Parts of Rubies' Santa Claus costume are 'well sewn' but not 'well made' . . . .");

*see also* Pl.'s Resp. at 2 ("A well-sewn costume . . . [is] not necessarily . . . an article of

wearing apparel for tariff classification purposes."); *id*. at 5 ("The distinction between a

well-made garment and a well-sewn costume is critical [to] determining whether . . . the

[Santa Suit] is 'fancy dress.'").  As evidence that the Santa Suit is not well-made, Ms.

Start points to its one-size fits all sizing, the quality of fabric and lining, and its

flammability directive.  Start Report at 10-11; *see also* Pl.'s MSJ at 10-11; Pl.'s Resp. at

3-4.

　　　　Plaintiff also contends that the Santa Suit "is not a well-constructed ball gown, a

safari outfit, or like garment that one would expect to find at a stylish *soiree*.  It is not a

uniform or an adult garment.  It is a costume . . . ."  Pl.'s MSJ at 15.  According to

Plaintiff, the Santa Suit "is worn, [but] it is not ordinarily worn; instead, it is placed on the

body and intended to depict Santa Claus."  Pl.'s Resp. at 8; *see also* Pl.'s MSJ at 23

("The [Santa Suit is] not ordinarily worn and [was] created for Christmas festivities.").

---

[22] Plaintiff also contends that Customs erred because "[v]irtually all of Rubies' costumes
are . . . sewn in [costume] factories," and "[a] 'costume' factory . . . generally [does not]
make[] . . . apparel[,] which has vastly different quality requirements."  Pl.'s MSJ at 11
(citing Pl.'s MSJ, Ex. 7 ("Beige Decl."), ECF No. 28-7).   Plaintiff's argument is premised
on facts that are both disputed by Defendant and that are immaterial to the classification
issue in question; thus, the court will not consider it.  *See* Pl.'s SOF ¶ 10; Def.'s Resp. to
Pl.'s SOF ¶ 10.

Finally, Plaintiff contends that the Santa Suit's design, use, function, and commercial market are relevant factors.  Pl.'s Resp. at 9-11.

In response to Plaintiff's expert, Defendant asserts that Ms. Start has too "narrowly define[d] articles of apparel by equating them with articles of 'fashion.'"  Def.'s XMSJ at 17 (noting that Ms. Start concluded that because the Santa Suit "was never part of any fashion development process" it is not "apparel" but is instead a "costume") (quoting Start Report at 5-8).  Pointing to the court's *Allstar* opinion, Defendant notes that none of the dictionary definitions cited by the court in its examination of the term "apparel" refer to "fashion" or a "fashion development process."  *Id.* at 17-18 (citing *Allstar*, 211 F. Supp. 3d at 1329-31).  Defendant cites several additional cases to support its contention "that 'non-traditional' articles of clothing constitute wearing apparel for classification purposes."  *Id.* at 18-19 (citing *Riddell, Inc. v. United States*, 754 F.3d 1375 (Fed. Cir. 2014) (football jerseys, pants, and girdles); *Lemans Corp. v. United States*, 660 F.3d 1311 (Fed. Cir. 2011) (motocross jerseys and pants, and motorcycle jackets); *H.I.M./Fathom*, 981 F. Supp. 610 (wetsuits and related accessories)).

Additionally, Defendant asserts the court should accord little weight to Ms. Start's expert opinion because it is unreliable and irrelevant.  Def.'s XMSJ at 28-32; Def.'s Reply at 9-12.  Specifically, Defendant contends that Ms. Start's opinion is "not based on relevant industry standards" and instead represents her "subjective beliefs," is contradictory at times, arbitrary, and lacking a logical foundation.  Def.'s XMSJ at 30. Defendant further contends that Ms. Start's opinion "touch[es] on issues of common

knowledge" and contains "an entire section dedicated to fashion theory and

development," which is "irrelevant to whether the Santa Suit is an article of 'wearing

apparel' or a 'festive article'" for classification purposes.  *Id.* at 31.

Finally, Defendant contends that the Santa Suit "is well[-]constructed, made to

last[,] and [able to] withstand multiple wearings and cleanings," and "provides decency,

comfort, adornment and protection."  *Id.* at 13.

### b.  Consideration of Plaintiff's Expert's Opinion

The court's consideration of Plaintiff's proffered expert testimony is guided by the

factors stated in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and Rule

702 of the Federal Rules of Evidence.  *See Libas, Ltd. v. United States*, 193 F.3d 1361,

1366 (Fed. Cir. 1999); *G.G. Marck & Associates, Inc. v. United States*, Slip Op. 15-62,

2015 WL 3757040, at *9 (2015) (relying on Rule 702 to determine the weight to afford

expert testimony to resolve summary judgment motions in a classification case).

Pursuant to Rule 702, expert testimony is admissible when

> (a) the expert's scientific, technical, or other specialized knowledge will
> help the trier of fact to understand the evidence or to determine a fact in
> issue; (b) the testimony is based on sufficient facts or data; (c) the
> testimony is the product of reliable principles and methods; and (d) the
> expert has reliably applied the principles and methods to the facts of the
> case.

Fed. R. Evid. 702.  The "trial judge, acting as 'gatekeeper,' must 'ensure that any and all

[expert] testimony or evidence admitted is not only relevant, but reliable.'"  *Libas*, 193

F.3d at 1366 (quoting *Daubert*, 509 U.S. at 589); *see also Kumho Tire Co., Ltd. v.*

*Carmichael,* 526 U.S. 137 (1999) (extending the court's "gatekeeping" role to all expert

testimony).[23]  In short, "for an expert witness's testimony to be admissible, it must be

reliable, relevant, and helpful to the trier of fact."  *G.G. Marck*, 2015 WL 3757040, at *9.

Ms. Start's opinion fails to meet any of the Rule 702 requirements.  Preliminarily,

the correct classification of the Santa Suit is a legal issue, not a factual issue, and one

that is resolved on the basis of the undisputed material facts set forth above.  *Bausch &*

*Lomb*, 148 F.3d at 1365; *supra* Background Sect. I.  Thus, there is no "trier of fact" to

aid.

Moreover, Ms. Start's opinion is unhelpful--and, thus, irrelevant--because she

approaches the inquiry from the perspective of "fashion theory" and "fashion

development," Start Report at 5-8, but whether an article constitutes apparel or fancy

dress for classification purposes does not depend on whether it is fashionable, *see,*

*e.g.*, *Rubie's II*, 337 F.3d at 1357.  Ms. Start's analysis of the Santa Suit applies

standards relevant to "menswear," Start Report at 10-11, but those are not the

standards articulated by the Federal Circuit, *see Rubie's II*, 337 F.3d at 1357, 1360.[24]

Ms. Start's opinion on this issue is also unreliable.  "[R]eliability is the touchstone

for expert testimony," *Libas*, 193 F.3d at 1366, and it requires more than subjective

---

[23] The *Libas* court noted that "*Daubert* and *Kumho* were decided in the context of
determining standards for the admissibility of expert testimony under the Federal Rules
of Evidence," but opined that "the proposition for which they stand, that expert testimony
must be reliable, goes to the weight that evidence is to be accorded as well as to its
admissibility."  193 F.3d at 1366.

[24] Plaintiff, therefore, is incorrect in its assertion that the Start Report "is based upon
[Ms. Start's] comprehension and understanding of *relevant* industrial standards in the
wearing apparel industry, and not on any subjective belief."  Pl.'s Resp. at 4 (emphasis
added).

belief or unsupported speculation, *Daubert*, 509 U.S. at 590.  Ms. Start's assertions are

highly general and often unsupported.  For example, she offers no basis for her

distinction between "well-made" and "well-sewn" for purposes of identifying wearing

apparel.  *See* Start Report at 10.  Ms. Start then contradicts her report during her

deposition when she acknowledges that apparel need not be "well-made," *see* Start

Dep. 122:11-14, and that the "[Santa Suit] jacket in particular was pretty much well-

made but [has] an acetate lining," *id.* at 149:20-150:3.  In fact, Ms. Start admitted that

she formed her opinion that the Santa Suit was not apparel before she even examined

it.  *Id.* at 124:13-21; *see also id.* at 182:22-183:4 (opining that a Santa Claus costume

"would still be a costume" even if "it was the most well-made").

Ms. Start's preconceived opinion regarding the Santa Suit highlights the problem

with her expert testimony.  She begins her report by stating that she has "been asked by

counsel for investigate [sic] and opine on the extent to which the Santa Claus costume

which [Plaintiff] created is a costume or well-made apparel, and therefore which

customs classification should be applied."  Start Report at 4.  She concludes her report

by noting that "[i]n casual discussions with friends and colleagues about this question of

whether a Santa Claus costume is a costume or apparel, it is usually followed by

laughter.  They cannot believe someone would consider a Santa costume as apparel."

Start Report at 12.  Ms. Start misunderstands the precise nature of the inquiry--or was

misinformed.  The issue is not whether the Santa Suit is a costume or apparel as those

terms are colloquially understood; rather, the issue is whether the Santa Suit is "fancy

dress, of textiles, of Chapters 61 or 62," or a "festive article," as those terms are defined

in the HTSUS and relevant case law, which is a legal question.  Though Ms. Start may

be a menswear/apparel fashion expert, her expertise is not helpful to the court's

analysis of the legal question before it, and, therefore, the court will not consider the

Start Report in making its determination.

### c.  The Jacket and Pants are "Fancy Dress, of Textiles, of Chapters 61 or 62"

The court is guided by the criteria stated in *Rubie's II*; that is, whether the jacket

and pants "are of a flimsy nature and construction, lacking in durability[,] and generally

not recognized as normal articles of wearing apparel."  337 F.3d at 1360.[25]

Considerations relevant to flimsiness and durability include the presence of "zippers,

inset panels, [and] darts or hoops, and whether the edges of the materials [are] raw or

finished."  *Id.* at 1357 (citing HQ 961447 generally as well as HQ 957948 and HQ

957952, which "set[] forth certain styling and sewing features of costumes which

exemplify the characteristics of 'textile articles of fancy dress' under Chapter 61 or 62").

In contrast to the merchandise at issue in *Rubie's II*, which "featured simple pull-

on type garments with no zippers," and raw and unhemmed edges, HQ 961447 at 4;

---

[25] Customs' Textile Costumes ICP, upon which CBP relied in the underlying ruling, further sets forth four criteria for assessing flimsiness and durability: styling, construction, finishing touches, and embellishments.  *See* Textile Costumes ICP at 11; HQ H237067 at 8.  The Textile Costumes ICP also recommends that "it is important to consider the *garment as a whole*," and "whether . . . it is reasonable to conclude that the article is a normal article of apparel."  Textile Costumes ICP at 11.  The only additional criteria provided for determining whether an article is a normal article of apparel are that "[n]ormal articles of apparel are usually designed for multiple wear and cleaning."  *Id.* Here, Customs based its classification determination on its finding that the jacket and pants are "well-made" pursuant to the ICP's four-factor flimsiness criteria and "are suitable for repeated wear and can only be dry cleaned."  *See* HQ H237067 at 9.

*see also Rubie's II*, 337 F.3d at 1352 n.2, the jacket, which is lined, has "a full front

opening secured by a zipper," which is hidden by a left-over-right faux fur cover held in

place by two metal snaps, one at the collar of the jacket and one at the base of the

jacket, Def.'s SOF ¶¶ 4, 6-7.  "The jacket has long sleeves with turned edges, trimmed

with white faux fur fabric cuffs," *id.* ¶ 8, and "a straight cut hemmed bottom trimmed with

the same white faux fur fabric," *id.* ¶ 9.  The physical characteristics (and physical

inspection) of the jacket indicate a substantial, durable item that will survive multiple

wearings and cleanings over several Christmas seasons, *see id.* ¶¶ 3, 25-26.

The pants present a closer question.  They are a "simple pull-on type garment"

with an elastic waist, but common knowledge dictates that the same may be said of

many pairs of pants that are unquestionably "wearing apparel."  The bottom of the pants

are not hemmed, though the image depicted on the packaging demonstrates that the

pants are to be tucked into the shoe covers; thus, the unhemmed bottom will not be

visible.  *See* Physical Sample.  The pants are lined, with tightly stitched interior seams,

and feature pockets with hemmed edges.  Def.'s SOF ¶¶ 11-12.  Taken together, the

pants, like the jacket, indicate a durable item that will survive multiple wearings and

cleanings.  *Id.* ¶¶ 3, 25-26.

To be sure, the jacket and pants may be intended for use only during the

Christmas season.  *See* Pl.'s MSJ at 22 ("It cannot be argued that people wear Santa

Claus costumes as everyday apparel . . . ."); Def.'s SOF ¶ 25.  But regularity of wear is

not dispositive; items that are worn for specific, perhaps infrequent, purposes may

constitute wearing apparel.  *See Riddell*, 754 F.3d at 1375 (football jersey's pants, and

girdles are classifiable as wearing apparel); *Lemans*, 660 F.3d at 1311 (motocross

jerseys and pants, and motorcycle jackets are wearing apparel); *H.I.M./Fathom*, 981 F.

Supp. at 610 (wetsuits and related accessories are wearing apparel).

There is language in *Rubie's II* that suggests the festive value of the costumes at

issue disfavored classification as wearing apparel:

> [while the imports may simulate the structural features of wearing apparel,
> and have some incidents of "clothes or coverings for the human body worn
> for decency or comfort," *Antonio [Pompeo]*, 40 Cust. Ct. at 364, they are
> not *practical* "articles which are ordinarily worn," *Arnold*, 147 U.S. at 496 . .
> . .  Rather, the Halloween costumes for consumers have enormous "make
> believe" or festive value during appropriate occasions such as Halloween
> and incidentally afford the element of covering for decency or comfort.  To
> the extent that such elements have any characteristics similar to "wearing
> apparel" to consumers of Halloween costumes, such features are clearly
> secondary to the costumes' festive value.

*Rubie's II*, 337 F.3d at 1358 (emphasis added); *see* Pl.'s MSJ at 15-16 (contending the

Santa Suit's "value as wearing apparel to the consumer is clearly secondary to its

'make-believe' or festive value").  The context in which the statement in *Rubie's II* was

made, however, involved costumes so flimsy their "principal intended use [was] for a

one time festive occasion," as "distinct from 'wearing apparel' which courts have held to

be used for decency, comfort, adornment or protection."  *Rubie's II*, 337 F.3d at 1356

(quoting HQ 961447 at 3).[26]  Thus, they were not "practical" articles of apparel, and their

---

[26] The costumes at issue in *Rubie's II* appear to resemble the children's Halloween
costumes Plaintiff produces and sells, which "do not have finished edges or zippers,
and close in the back with Velcro or a snap, or are made to 'slipover' the wearer," are
intended for one-time use, and retail for 10-20 USD.  Def.'s SOF ¶¶ 19, 21-23.  In
contrast, the Santa Suit retails for 100 USD and is intended to be worn numerous times.
*Id.* ¶¶ 25-26.

festive value exceeded their value as wearing apparel.  *See id.* at 1358.  In contrast, the

Santa Suit jacket and pants are manufactured for "repeated[]" wear over several

Christmas seasons, i.e., years, are suitable for dry cleaning, and provide warmth and

protection to the wearer.  Def.'s SOF ¶¶ 3, 25-27.  They are articles--jackets and pants--

that are "ordinarily worn."  *See Arnold,* 147 U.S. at 496 (the term "wearing apparel"

covers "all articles of dress").

    Further, the court does not interpret *Rubie's II* as supplying a bright-line rule

whereby any item of festive value is excluded from classification as wearing apparel.

Note 1(e) excludes from Chapter 95 articles that are *prima facie* festive articles but also

"fancy dress, of textiles, of Chapter 61 or 62."  In other words, Note 1(e) excludes a

subset of festive articles that also meet certain requirements.  Undue emphasis on the

festive or make-believe nature of the article would nullify Note 1(e); such an interpretive

approach has long been disfavored.  *Cf, e.g*., *D. Ginsberg & Sons, Inc. v. Popkin*, 285

U.S. 204, 208 (1932) (it is a "cardinal rule" that "if possible, effect shall be given to every

clause and part of a statute").  Accordingly, the Santa Suit's association with the

Christmas season does not foreclose its classification as wearing apparel.[27]

---

[27] Plaintiff seeks to rely on the court's recent *Allstar* opinion.  Pl.'s MSJ at 23.  According
to Plaintiff, the court, in *Allstar*, noted that *Rubie's II* "held that costumes are not
ordinarily worn, and although costumes impart decency or comfort for the wearer, such
benefits were incidental to their primary purpose, that is, . . . Halloween fun."  *Id.* (citing
*Allstar*, 211 F. Supp. 3d at 1331).  The *Allstar* court discusses the *Rubie's II* court's
findings vis-à-vis the costumes at issue in that case, not costumes generally.  The court
did not--and does not--construe *Rubie's II* as foreclosing all costumes from classification
as wearing apparel.  If all items reflecting festive or make-believe value were eliminated
from the scope of the phrase "of textiles, of Chapter 61 or 62," there would be nothing
for Note 1(e) to exclude.

In sum, the jacket and pants constitute fancy dress of a durable, non-flimsy nature, and are normal articles of apparel classifiable pursuant to Chapter 61.  They are, therefore, excluded from Chapter 95.[28]

Proceeding to the precise classification, "[g]arments of [Chapter 61] designed for left over right closure at the front shall be regarded as men's or boys' garments."  Ch. 61, Note 9.  The jacket has a left-over-right faux fur cover held in place by two metal snaps, one at the collar of the jacket and one at the base of the jacket, Def.'s SOF ¶¶ 6-7; thus, it is classifiable as a men's or boy's garment.

Heading 6105, pursuant to which Customs classified the jacket, covers "[m]en's or boy's shirts, knitted or crocheted."  *See* HQ H237067 at 11.  However, Note 4 to

---

[28] This finding is supported by Explanatory Note ("EN") 95.05, which suggests that heading 9505 covers "[f]estive, carnival or other entertainment articles, *which in view of their intended use are generally made of non-durable material*," for example, "[a]rticles of fancy dress, [such as] masks, false ears and noses, wigs, false beards and moustaches," but not "fancy dress of textile materials, of Chapter 61 or 62."  EN 95.05 (boldtype omitted) (other emphasis added).  The Federal Circuit disapproved of the *Rubie's I* court's reliance on EN 95.05 as support for the lower court's conclusion that the costumes at issue did not belong in Chapter 95 because the type of fancy dress EN 95.05 contemplates as covered thereunder includes accessories to costumes rather than the actual textile costumes.  *Rubie's II*, 337 F.3d at 1359 ("Although the examples in the Explanatory Notes are probative and sometimes illuminating, we shall not employ their limiting characteristics, to the extent there are any, to narrow the language of the classification heading itself. Nothing from the pertinent subheading 9505.90.6000— 'Festive, carnival or other entertainment articles: Other: Other'—limits 9505.90.6000 only to accessories.").  It is also true, however, that the ENs are generally "indicative of proper interpretation" of the tariff schedule.  *Lynteq*, 976 F.2d at 699.  Although not all festive articles are made of non-durable material, *see Michael Simon Design*, 501 F.3d at 1305, 1306-07 (classifying festive sweaters as festive articles), EN 95.05 supports the court's consideration of the Santa Suit jacket's durability, and its finding that the jacket's durability distinguishes it from the costumes in *Rubie's II* and disfavors classification in Chapter 95.

Chapter 61 states that "[h]eading[] 6105 . . . [does] not cover . . . garments having an average of less than 10 stitches per linear centimeter in each direction counted on an area measuring at least 10 centimeters by 10 centimeters." Ch. 61, Note 4. Laboratory testing conducted in the course of this litigation demonstrates that the jacket does not meet Note 4's requirement. Pl.'s Suppl. Br, Ex. 1; Def.'s Suppl. Br., Ex. 2. Thus, it is not classifiable as a shirt.

Parties dispute the proper alternative classification. Plaintiff contends the jacket may be classifiable as a coat pursuant to HTSUS 6101.30.20, a suit-type jacket pursuant to HTSUS 6103.33.20, or in the "basket" provision pursuant to HTSUS 6114.30.30, which covers articles not specifically described elsewhere in Chapter 61. Pl.'s Suppl. Br. at 3-4.[29] Defendant disagrees with most of Plaintiff's proposed alternatives. *See generally* Def.'s Resp. to Pl.'s Suppl. Br., ECF No. 42. Defendant instead contends that the jacket is classifiable as a "[s]weater[], pullover[], sweatshirt[], waistcoat[] (vest[]) [*or*] similar article[]" pursuant to HTSUS 6110.30.30. Def.'s Suppl. Br. at 3-5 (emphasis added). Defendant alternatively contends the jacket is classifiable pursuant to the basket provision, HTSUS 6114.30.10. *Id.* at 5-6. Plaintiff disagrees with Defendant's assertion that the jacket is classifiable pursuant to HTSUS 6110.30.30, *see* Pl.'s Reply to Government's Resp. as to Alternative Classifications ("Pl.'s Suppl. Reply") at 2, ECF No. 43, and contends that the whole inquiry underscores its assertion that the

---

[29] Plaintiff affirms its position that the Santa Suit should be classified pursuant to Chapter 95, and responds to the court's order only "by assuming *arguendo* that it is not." Pl.'s Suppl. Br. at 1.

Santa Suit "is a 'festive' article celebrating the Christmas holiday, and not an 'apparel'

article normally worn as clothing," *id.* at 3.

Heading 6101 covers "Men's or boys' overcoats, carcoats, capes, cloaks,

anoraks (including ski-jackets), windbreakers and similar articles, knitted or crocheted,

other than those of heading 6103."  The relevant Explanatory Note indicates that such

items are "characterised [sic] by the fact that they are generally worn over all other

clothing for protection against the weather."  EN 61.01.  The subject jacket may be worn

over other clothing or just undergarments, Def.'s SOF ¶ 10, and although it affords

some protection, *id.* ¶ 27, it is not worn *for* protection as are the heading's exemplars.

Heading 6103 covers "suit-type jackets [and] blazers."[30]  The relevant

Explanatory Note indicates that "[t]he 'jackets or blazers' have the same characteristics

as the suit coats and suit jackets described in Chapter Note 3(a) and in Part (A) [to EN

61.03]."  EN 61.03.  Part (A) to EN 61.03 describes jackets with "a full front opening

without a closure or with a closure other than a slide fastener (zipper)."  The Santa Suit

jacket has a zipper closure, Def.'s SOF ¶ 6; thus, it is not covered by heading 6103.

---

[30] Heading 6103 also covers "[m]en's or boy's suits [and] ensembles."  Note 3(a)
provides that "[t]he term 'suit' means," *inter alia*, "two or three pieces made up, in
respect of their outer surface, in identical fabric."  Ch. 61, Note 3(a).  Likewise, the term
"ensemble" refers to "a set of garments . . . composed of several pieces made up in
identical fabric."  Ch. 61, Note 3(b). The subject jacket and pants are not made of
identical fabric: the jacket features faux fur fabric, whereas the pants do not.  Def.'s SOF
¶¶ 8, 11-12.  And, the Santa Suit as a whole is composed of several additional pieces
made up of different materials.  *Id.* ¶ 1.  Thus, neither the jacket and pants, nor the
Santa Suit as a whole, are classifiable as a "suit" or "ensemble."

Heading 6110 covers "[s]weaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted."   Defendant offers the following dictionary definitions of the named articles: (1) sweater: "[c]lothing for the upper part of the body worn either as an outer-garment or under a coat or jacket," Charlotte Mankey Calasibetta, *Essential Terms of Fashion: A Collection of Definitions* ("*Essential Terms of Fashion*") 210 (Fairchild Publications) (1986));[31] (2) pullover: "[a]ny light knit shirt without neck placket or fastening," alternatively, "[s]weater with round, crew, or V-neck pulled on over the head as contrasted with a cardigan or coat sweater, which opens down the front, Charlotte Mankey Calasibetta & Phyllis Tortora, *The Fairchild Dictionary of Fashion* ("*Dictionary of Fashion*") 408, 441 (Fairchild Publications, Inc.) (2003);[32] (3) sweatshirt: "[l]ong-sleeved, fleece-backed, cotton-knit pullover or zipped-front knit shirt made with rib-knit crew neck . . ., rib-knit cuffs and waistband," *id.* at 408; and (4) vest: "[a]n item of wearing apparel extending to the waist or longer . . ., usually worn over a blouse or shirt and sometimes under a suit jacket," *Essential Terms of Fashion* at 225. According to Defendant, the named articles

> are united by the following essential characteristics: each article covers the upper body; provides some warmth but does not protect against the elements (wind, rain or extreme cold); and, may be worn over a lighter garment (shirt or undershirt) but is not designed to be worn over all other clothing.

---

[31] *Essential Terms of Fashion* is Exhibit 3 to Defendant's supplemental brief.   *See* Def.'s Suppl. Br., Ex. 3, ECF No. 41-3.
[32] *Dictionary of Fashion* is Exhibit 1 to Defendant's supplemental brief.   *See* Def.'s Suppl. Br., Ex. 1, ECF No. 41-1.

Def.'s Suppl. Br. at 4.  Defendant contends that because the jacket shares these characteristics, it is a "similar article" pursuant to the rule of *ejusdem generis*.  *Id.* at 3-4.

The rule of *ejusdem generis*[33] provides that when "general words follow an enumeration of specific items, the general words are read as applying only to other items akin to those specifically enumerated."  *Schlumberger Tech. Corp. v. United States*, 845 F.3d 1158, 1165 n.8 (Fed. Cir. 2017) (citation omitted).  In "classification cases, *ejusdem generis* requires that the imported merchandise possess the *essential characteristics or purposes* that unite the articles enumerated *eo nomine* [by name] in order to be classified under the general terms."  *Totes II*, 69 F.3d at 498 (citation omitted) (emphasis added); *see also Victoria's Secret Direct, LLC v. United States*, 769 F.3d 1102, 1107 (Fed. Cir. 2014) ("Applying the phrase 'and similar articles' to the merchandise at issue, then, requires determining whether the merchandise, considering all of its features, shares the unifying characteristics of the particular heading.").[34] Identifying the essential (or unifying) characteristics is "a question of law" and "a matter of common sense."  *Victoria's Secret*, 769 F.3d at 1107.  "[T]he unifying characteristics may consist of both affirmative features and limitations."  *Id.*

As Defendant suggests, the named articles share the essential characteristics of covering the upper body, providing some degree of warmth, and being suitable for wear

---

[33] *Ejusdem generis* "means 'of the same kind.'"  *Totes, Inc. v. United States* ("*Totes II*"), 69 F.3d 495, 498 (Fed. Cir. 1995), *aff'g Totes, Inc. v. United States* ("*Totes I*"), 18 CIT 919, 865 F. Supp. 867 (1994).

[34] The rule of *ejusdem generis* "does not apply . . . when the items do not fit into any kind of definable category."  *Victoria's Secret*, 769 F.3d at 1107 n.1 (internal quotation marks and citation omitted).

over a light garment.   The Santa Suit jacket shares these characteristics.  *See* Physical

Sample (demonstrating the obvious point that the jacket is worn on the upper body);

Def.'s SOF ¶¶ 10, 27 (it is undisputed that the jacket may be worn over an

undergarment or clothing, and provides warmth to the wearer); *Victoria's Secret*, 769

F.3d at 1107 (instructing courts to first consider the unifying characteristics before

determining whether the subject merchandise shares those characteristics).[35]

The relevant Explanatory Note supports the court's finding with respect to the

exemplars' essential characteristics and the jacket's sharing of those characteristics.  It

provides that "heading [6110] covers a category of knitted or crocheted articles, without

distinction between male or female wear, *designed to cover the upper parts of the body*

(jerseys, pullovers, cardigans, waistcoats *and similar articles*)."  EN 61.10 (emphasis

added).  Defendant defines "cardigan" as "a sweater or jacket that opens the full length

of the center front and usu. has a round or V-shaped collarless neck," Def.'s Suppl. Br.

at 5 (quoting Webster's Third New Int'l Dictionary of the English Language Unabridged

(1993) ("Webster's") at 337), or as "[a]n adjective used to describe collarless garments

---

[35] The Federal Circuit notes that an article may not "share[] the heading's unifying characteristics" when it has "a more specific primary purpose that is inconsistent with the listed exemplars."  *Victoria's Secret*, 769 F.3d at 1107 (citation omitted).  In other words, the subject merchandise may share the essential characteristics but have some other features that "defeat 'similarity'— necessarily meaning that the unifying characteristics of the heading's list include a limitation that excludes such other features."  *Id.* at 1107-08.  The Santa Suit jacket's festive value is not inconsistent with the named articles.  Moreover, the enumerated items are not strictly limited to items lacking festive or make-believe value.  Indeed, Note 1(e) instructs that wearing apparel may have festive or make-believe value, or else there would be no "fancy dress, of textiles, of chapter 61 or 62" to exclude.  *See supra* note 27 and accompanying text.

with round or V-necklines that button down the front," *id.* (quoting *Dictionary of Fashion* at 61).  Defendant contends that the jacket is like a cardigan "because, although it has a collar which cardigans do not, it is a knitted article, designed to cover the upper body, and it has a full length opening in the center front."  *Id.* (citing Physical Sample).  Plaintiff characterizes Defendant's argument as "convoluted" and "ludicrous."  Pl.'s Suppl. Reply at 2 ("In support of its position, [D]efendant actually makes the convoluted argument that since a cardigan is a collarless sweater or jacket, a jacket can be classified as a sweater.  This argument is ludicrous . . . .").  But Plaintiff is incorrect.

The Explanatory Note provides examples of articles that share the essential characteristics of the articles named in the heading; that is, articles that cover the upper body, provide warmth, and may be worn over a light garment.  Moreover, the Explanatory Note's exemplars do not represent the limits of what may be deemed "similar" to the heading's exemplars.  *See* EN 61.10 (heading 6110 includes "jerseys, pullovers, cardigans, waistcoats *and similar articles*") (emphasis added); *Rubie's II*, 337 F.3d at 1359 (courts should not employ any "limiting characteristics [in the Explanatory Notes' exemplars], to the extent there are any, to narrow the language of the classification heading itself").  The jacket's addition of a collar, which a cardigan *may* have, *see* Def.'s Suppl. Br. at 5 (quoting Webster's at 337), is not dispositive because the absence of a collar is not a defining feature of the exemplars in the heading or Explanatory Note.   Moreover, common knowledge dictates that waistcoats (or vests) may have a collar and, thus, are not, by definition, collarless.  *See Brookside Veneers*, 847 F.2d at 789 (courts may rely upon their own understanding of HTSUS terms).   The

exemplars in the heading and the Explanatory Note are all distinct in various respects, but they also share the essential characteristics of covering the upper body, providing warmth, and being suitable for wear over a light garment, as does the Santa Suit jacket. Accordingly, it is classifiable pursuant to heading 6110, specifically, HTSUS 6110.30.30, which covers "[s]weaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted. . . . [o]f man-made fibers . . . [o]ther."[36]

As to the pants, heading 6103 covers "men's or boy's . . . trousers . . . ." "Trousers" may be defined as "an outer garment extending from the waist to the ankle . . . , covering each leg separately, made close-fitting or loose-fitting in accord with the fashion of different periods."  Webster's at 2453.  The pants are classifiable pursuant thereto; specifically, HTSUS 6103.43.15 (covering "men's or boy's . . . trousers . . . [o]f synthetic fibers . . .  [o]ther").[37]

---

[36] HTSUS 6110.30.30 provides a rate of duty of 32% *ad valorem*, which is the same as HTSUS 6105.20.20 pursuant to which Customs classified the jacket.  *See* Pl.'s SOF ¶ 4; Def.'s Resp. to Pl.'s SOF ¶ 4.

[37] Plaintiff contends, without citation to supporting authority, that the Santa Suit's "design, use, function[,] and commercial market" are "highly relevant" to its classification.  Pl.'s Resp. at 9-10.  The Federal Circuit has held that use may be an appropriate consideration when examining classification under competing *eo nomine* provisions.  *GRK Can., Ltd. v. United States*, 761 F.3d 1354, 1355 (Fed. Cir. 2014) (trial court erred in refusing to consider use to determine whether subject merchandise should be classified as self-tapping screws or wood screws). Accordingly, use may be considered when determining the commercial meaning of a term in an *eo nomine* provision when the merchandise named in that provision "inherently suggests a type of use," or when determining whether a particular article "fits within the classification's scope."  *Id.* at 1358-59 (citations omitted).  As to the latter inquiry, the court may consider "the subject article's physical characteristics, as well as what features the article has for typical users, how it was designed and for what objectives, and how it is marketed."  *Id.* at 1358 (citations omitted).   Here, the court is tasked with determining whether the Santa Suit jacket and pants are described by Note

## IV.   Classification of the Gloves

Heading 6116 covers knitted gloves, mittens and mitts.  The gloves, which

consist of polyester knit fabric, Def.'s SOF ¶ 13, are *prima facie* classifiable pursuant to

heading 6116.  Accordingly, they are excluded from classification under Chapter 95.

*See* Ch. 95, Note 1(u).  The gloves are properly classified pursuant to HTSUS

6116.93.94[38] (covering "[g]loves . . . [o]f synthetic fibers . . . . [o]ther . . . [w]ith

fourchettes").[39]

## V.   Classification of the Sack

Heading 4202 covers "traveling bags, . . . knapsacks and backpacks, handbags,

shopping bags, . . . sports bags, . . . and similar containers, . . . of textile materials."

The sack consists of the same plush fabric as the jacket and pants, and has a

drawstring cord.  Def.'s SOF ¶ 14.  It is described in the packaging as a "toy bag."

Physical Sample.  The Government contends that the sack is classifiable pursuant to

---

1(e) to Chapter 95, thereby foreclosing them from classification as festive articles
pursuant to that chapter.  *Cf. Sigma–Tau HealthScience, Inc.*, 838 F.3d at 1277, 1278
(declining to consider use when interpreting an *eo nomine* provision, and noting that a
chapter note determined under which of two competing provisions the subject
merchandise must be classified); *Allstar*, 211 F. Supp. 3d at 1332-37 (considering such
factors as design, use, function, and marketing to determine whether the Snuggie® is
classifiable as a garment or blanket).  That determination is guided by the Federal
Circuit's interpretation of the relevant tariff terms.  *See Avenues in Leather*, 423 F.3d at
1331 (the court is bound by the Federal Circuit's interpretation of tariff terms).
Accordingly, Plaintiff's argument is unavailing.
[38] HTSUS 6116.93.94 provides a rate of duty of 18.6% *ad valorem*, which is more than
the 10% duty rate Customs assessed pursuant to HTSUS 6115.95.60.  *See* Pl.'s SOF
¶ 4; Def.'s Resp. to Pl.'s SOF ¶ 4.
[39] A "fourchette" is "the strip or shaped piece used for the sides of the fingers of a
glove."  Webster's at 898.  The subject gloves have fourchettes.  *See supra* note 6.

heading 4202 because it shares the "essential purpose" or "essential characteristics,"

and "is of the same class of kind," as the named articles.  Def.'s XMSJ at 24, 25.[40]

Defendant points the court to *Totes I*, 18 CIT at 924-25, 865 F. Supp. at 872,[41] and

*Processed Plastic Co. v. United States*, 29 CIT 1129, 395 F. Supp. 2d 1296 (2005).[42]

Heading 4202 is an *eo nomine* provision, *Totes II*, 69 F.3d at 498, which

therefore "include[s] all forms of the named article," *Carl Zeiss, Inc. v. United*

*States,* 195 F.3d 1375, 1379 (Fed. Cir. 1999).  Additionally, the term "similar containers"

implicates the rule of *ejusdem generis*.  *Processed Plastics*, 29 CIT at 1147 n.30, 395 F.

Supp. 2d at 1313 n.30.   The Federal Circuit has defined the essential characteristics of

the heading 4202 exemplars as "organizing, storing, protecting, and carrying various

items."  *Totes II*, 69 F.3d at 498 (approving of the trial court's determination of same).

Here, the sack's plush material, drawstring cord, and description as a "toy bag"

indicates that it serves the purpose of storing, protecting, and carrying toys.  Def.'s SOF

¶ 14; Physical Sample.[43]  With some effort, the drawstring cord may be pulled tightly

---

[40] Plaintiff did not respond to Defendant's argument.  *See generally* Pl.'s Resp.
[41] In *Totes I*, the court applied the rule of *ejusdem generis* to classify trunk organizers pursuant to Heading 4202 because they "possess[ed] the essential characteristics of or serve[ed] a common purpose like that served by the exemplars in Heading 4202, and hence by the operation of *ejusdem generis* fall within the purview of 'similar containers.'" 18 CIT at 924-25, 865 F. Supp. at 872.
[42] In *Process Plastics*, the court determined that children's backpacks and beach bags were properly classified pursuant to Heading 4202, and not as "toys" pursuant to heading 9503, in part, because they "serve[d] the purposes of *organizing, storing,* and *protecting* toys or other personal effects."  29 CIT at 1145-48, 395 F. Supp. 2d at 1312-14.
[43] Webster's defines "bag," *inter alia*, as "a container made of . . . cloth, . . . or other flexible material and usu. closed on all sides except for an opening that may be closed (as by folding, pasting, tying, or sewing), being of sizes ranging from small to very large

closed to prevent toys from falling out, or it may be used to tie off the top of the sack.

Physical Sample.  To the extent the sack lacks compartments and pockets, its

organizational capacity is unclear.  However, the ubiquitous textile "shopping bag," one

of the named articles, also generally lacks organizational features, so the court does not

find the lack of organizational capacity dispositive.  *See, e.g.*, *Brookside Veneers,* 847

F.2d at 789 (courts may rely on their own understanding of terms).  Further, not all of

heading 4202's exemplar's necessarily share all of the above-stated essential

characteristics.  *See Totes I*, 18 CIT at 925, 865 F. Supp. at 873 (noting that "some" of

the exemplars are designed to carry their contents).  Because the sack serves the

purposes of storing, protecting, and carrying, it is *prima facie* classifiable pursuant to

heading 4202.  It is, therefore, foreclosed from classification pursuant to Chapter 95.

Ch. 95, Note 1(d).

Proceeding to the appropriate subheading, "[t]ravel, sports and similar bags . . .

of textile materials: [o]ther," are covered by subheading 4202.92.30.  The phrase "travel,

sports and similar bags," includes articles "designed for carrying clothing and other

personal effects during travel, including . . . shopping bags."  Ch. 42, Add'l U.S. Note 1.

The sack appears capable of carrying toys (or other personal effects) from A to B,

similar to a shopping bag.  Accordingly, the sack is properly classified pursuant to

HTSUS 4202.92.30.

_____

and being specially designed and treated for properly holding, storing, carrying,
shipping, or distributing any material or product--compare POUCH, SACK."  Webster's
at 162.  The sack fits that definition.  *See* Physical Sample.

CONCLUSION

For the reasons discussed above, the components of the Santa Suit at issue in this case are properly classified pursuant to the following HTSUS provisions: (1) jacket: HTSUS 6110.30.30; (2) pants: HTSUS 6103.43.15; (3) gloves: HTSUS 6116.93.94; and (4) sack: HTSUS 4202.92.30.  Accordingly, the court denies Plaintiff's motion for summary judgment and grants Defendant's cross-motion for summary judgment.[44] Judgment will be entered accordingly.


                                                              /s/      Mark A. Barnett
                                                              Mark A. Barnett, Judge


Dated: October 31, 2017
            New York, New York

---

[44] Defendant requested summary judgment for the reasons "explained in [its] accompanying memorandum of law."  Def.'s Cross-Mot. for Summ. J. at 1.  Defendant's memorandum of law urged the court to affirm Customs' classification of the subject jacket pursuant to HTSUS 6105.20.20.  Def.'s XMSJ at 1.  As discussed above, in supplemental briefing, Defendant acknowledged that HTSUS 6105.20.20 does not cover the subject jacket, and asserted that HTSUS 6110.30.30 is the correct classification.  Def.'s Suppl. Br. at 4-5.  The court agrees.  Accordingly, the court construes Defendant's cross-motion as being amended by its supplemental brief, and therefore grants the motion in full.